UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

RAUL MENDEZ,

                    Plaintiff,

v.

SAINT ALPHONSUS REGIONAL
MEDICAL CENTER, INC., a general
non-profit corporation,

                    Defendant.

Case No. 1:12-cv-00026-EJL-CWD

**REPORT AND RECOMMENDATION**

        Plaintiff Raul Mendez brings this action against his former employer, Saint

Alphonsus Regional Medical Center (SARMC), alleging unlawful discrimination in the

workplace. Mendez claims SARMC violated Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.*, and the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*,

by subjecting him to discrimination and a hostile work environment on the basis of his

race, national origin, and religion. Mendez is Hispanic and a member of the Church of

Jesus Christ of Latter Day Saints (LDS). He also claims SARMC violated Title VII by

disciplining him and ultimately terminating his employment in retaliation for his reports

of discrimination. Additionally, Mendez claims SARMC breached the covenant of good

faith and fair dealing implicit in his employment contract.

SARMC filed a motion for summary judgment (Dkt. 48), seeking summary dismissal of all of Mendez's claims. United States District Judge Lodge referred this case to the undersigned for all matters. (Dkt. 39.) SARMC's motion for summary judgment is fully briefed and the parties presented oral arguments on August 28, 2014. After carefully considering the parties' arguments and the record before it, the Court issues this Report, recommending that SARMC's motion be granted.

## BACKGROUND

1.     **Facts**[1]

     A.     **SARMC**

     SARMC is a general non-profit corporation organized under the laws of the State of Idaho and engaged in the business of providing medical services in the Treasure Valley and elsewhere in Idaho. SARMC has established policies governing the performance and conduct of its employees. Although SARMC reserves the right to terminate an individual's employment when it deems appropriate, the policy allows for a variety of corrective disciplinary actions. Depending on the circumstances, an employee subject to discipline may be offered performance counseling. The counseling process may include a verbal or written warning from the employee's supervisor; written performance counseling outlining the offense, expected changes, and consequences for

---

[1]     The following facts are undisputed or, when disputed, taken in the light most favorable to Mendez, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the nonmoving party on motion for summary judgment).

continuing the offense behavior; and final written counseling specifying a timeline for improvements and notifying the employee that failure to improve may result in immediate termination. Further, the performance and conduct policy lists conduct, such as "gross insubordination" or "refusal to accept a job assignment for which [an employee is] properly trained," that may trigger performance counseling or result in discharge from employment. (Mendez Depo., Ex. 13, Dkt. 48-7 at 87.)

It is SARMC's policy "to provide equal employment opportunity to all employees and applicants for employment." (*Id*. at 77.) SARMC's equal employment opportunity policy prohibits discrimination in employment based on race, religion, gender, national origin, disability, age, veteran or military status, or any other reason prohibited by law. The policy also directs any employee who believes he or she has been discriminated against to bring the matter to the attention of management or human resources personnel.

In addition to its nondiscrimination policy, SARMC has created an Organizational Integrity Program (OIP). Through the OIP, SARMC encourages employees to report possible violations of law, regulations, policies, procedures, or SARMC's standards of employee conduct. Reports, which may include alleged discrimination, can be directed to an employee's supervisors, Human Resources representatives, a hotline, or to a SARMC Integrity Officer. Reports to the OIP are treated as confidential. Additionally, the OIP strictly prohibits retaliation or harassment against employees who make good faith reports. However, SARMC's OIP policy makes clear that non-retaliation "does not mean that employees or others will be shielded . . . from the consequences of their actions under current employment policies." (Mendez Depo., Ex. 14, Dkt. 48-8 at 1-2.)

## B.    Mendez's Employment History with SARMC

In 2007, SARMC hired Mendez as a radiology technician at a clinic in Nampa, Idaho (the Iowa Clinic). He initially worked part-time but moved to a full-time position at the Iowa Clinic on March 15, 2009. In exchange for a full-time schedule, Mendez agreed to perform non-radiology assignments, including DXA scans, medical record scanning, and backup support in the clinic laboratory. Mendez performed these duties under the supervision of the Lead Nurse, Rachel Croft, and Clinic Manager, Connie Miller.

In late 2009, Mendez started refusing to perform assigned duties and complaining to coworkers about his supervisors and the work environment at the Iowa Clinic. For example, in a November 29, 2009 email to Judi Vejar, the SARMC Human Resources Representative responsible for the Iowa Clinic, Mendez pointed out a variety of staffing problems at the Clinic. Because of these problems, Mendez stated that he "refuse[d] to work in the lab as phlebotomist until issues with organization and teamwork have been sorted out." (Mendez Depo., Ex. 26, Dkt. 48-8 at 33.) In an April 16, 2010 email to a coworker, Mendez complained of "backstabbing and bullshit at this facility." (Mendez Depo., Ex. 8, Dkt. 48-7 at 65.)  And, in an October 6, 2010 email to a radiology technician at another SARMC clinic, Mendez opined that Croft "has no leadership qualities, and quite simply she is not a good RN." (Mendez Depo., Ex. 24, Dkt. 48-8 at 27.)

Also in late 2009, Mendez claims he told Vejar that Miller made offensive comments about his Hispanic race and, more generally, about members of the LDS Church. For example, Mendez told Vejar that Miller said: "They must not take showers

where [Mendez is] from." (Mendez Depo. 43:3-23, Dkt 48-7 at 13.) Mendez also alleges

Miller at one time chided him for "not eating enough tacos at home," but it is not clear

whether he reported this comment to Vejar. (*Id*. at 42:12-20.) In addition, Mendez told

Vejar that Miller expressed her dislike for members of the LDS Church, stating they

belong to "a cult" and have "their own God."(*Id*. at 68:9-69:12.)

Starting in February of 2010, Mendez's coworkers began complaining to Miller

about Mendez's negative attitude and behavior in the workplace. For example, one of

Mendez's coworkers told Miller in a February 5, 2010 email that Mendez was "rude and

disrespectful" when he accused her of a scheduling error in front of clinic staff and

patients. (Mendez Depo., Ex. 9, Dkt. 48-7 at 66.) Leonna McDowell, whom Mendez

assisted in the laboratory, emailed Miller on the afternoon of May 7, 2010, stating "[t]his

negativity with Raul [Mendez] has been going on for about a year now." (Mendez Depo.,

Ex. 7, Dkt. 48-7 at 64.) She claimed that Mendez made negative comments about the

Iowa Clinic work environment, encouraged her to look for a new job, and referred to

Miller as a "bitch." (*Id.*) McDowell also reported that Mendez propped open a laboratory

door after Miller instructed him not to do so. Mendez denies propping the door open and

making the statements reported by McDowell.

Miller gave Mendez a verbal warning about his behavior on the morning of May

7, 2010.[2] Their discussion touched on at least three topics. First, Miller asked Mendez to

---

[2]     Mendez now denies this meeting occurred (Dkt. 72 at 4), but he previously
acknowledged it occurred in his December 13, 2013 deposition testimony. (Mendez Depo., 52:7-
9, Dkt. 48-7 at 15.) Given Mendez's earlier sworn testimony about the May 7 meeting, his later
denial does not create a genuine issue of fact. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526

refrain from making negative, hurtful, or otherwise inappropriate comments to his coworkers. Second, she expressed her expectation that Mendez address his work concerns through his chain of command—that is, through Croft, Miller, or Human Resources. Third, based on a complaint from one of the doctors at the Iowa Clinic, Miller requested that Mendez endeavor to complete imaging and scans more quickly.

On the afternoon of May 7, 2010—following the warning from Miller—Mendez emailed a complaint to SARMC's OIP Local Integrity Officer. The complaint alleges Miller told staff "X-ray smells so bad and Raul doesn't take showers." (Mendez Depo., Ex. 11, Dkt. 48-7 at 70.) It goes on to state that Mendez and coworkers heard Miller make derogatory remarks about the LDS Church and its members. For example, Mendez alleged that Miller "hoped to someday get rid of 'those two Mormons' that work on the side where the lab is located."[3] (*Id.*) Based on these allegations, Mendez's OIP complaint claims Miller "created a hostile work environment" and treated LDS staff unfairly because of their religion. (*Id.*)

Following Mendez's OIP complaint, SARMC launched a confidential investigation of the allegations against Miller during May of 2010. The investigator interviewed Mendez, but Mendez did not otherwise discuss with anyone the investigation or his complaint against Miller. As a result of concerns raised by Mendez and others,

---

U.S. 795, 797 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement").

[3]    The identity of "those two Mormons" is not apparent from Mendez's May 7 email to the OIP. During his deposition, however, Mendez clarified that Miller was referring to two other Iowa Clinic employees, not to Mendez. (Mendez Depo. 68:3-5, Dkt. 48-7 at 19.)

Miller resigned in lieu of discharge on June 1, 2010. (Wedman Dec. ¶ 3, Dkt. 48-3 at 2.) Brenda McCord took over as interim Clinic Manager immediately after Miller's resignation. And, in August of 2010, Shane Allen, a Human Resources generalist for SARMC, transferred into the Iowa Clinic Manager's position.

Before she resigned, Miller provided Mendez with a written summary of their May 7 meeting on May 18, 2010. While the summary was intended to "provide objective feedback," it also serves as a disciplinary warning in that Miller explains her expectations for Mendez's future conduct. (Mendez Depo., Ex. 10, Dkt. 48-7 at 68.) In addition to the three topics discussed above, the summary sets forth Miller's concerns about Mendez leaving the clinic to get film and propping the laboratory door open. The summary also includes a handwritten notation that Mendez "denies the accusations" but "agreed to communicate with [Croft] and also to let [Miller] know before going to others if [Miller is] doing something he feels uncomfortable with." (*Id.*)

On May 25, 2010, Croft issued a formal written Disciplinary Action Record, citing Mendez for insubordination and retaliation. This Record indicates Mendez had disobeyed his managers' orders not to retaliate against McDowell, who, also on May 7, had complained to Miller about Mendez. Specifically, Mendez made McDowell feel uncomfortable for reporting her concerns to management by calling her at home and refusing to assist her in the laboratory. The Record also instructs Mendez to contact Chief Operating Officer Patti Brahe if he believed he had been unfairly disciplined. And it warns Mendez: "Any further violation of departmental or medical center policies or

procedures will result in immediate termination of your employment." (Mendez Depo. Ex. 15, Dkt. 48-8 at 5.)

After Miller's June 1 resignation, Croft, with input from the interim Clinic Manager McCord, completed an annual written performance evaluation of Mendez on June 17, 2010. The evaluation notes that Mendez rarely makes errors in the radiology department but needs to improve his efficiency and time management skills. With regard to Mendez's performance outside the radiology department, the evaluation states Mendez is "not proactive" and recently resisted performing other assigned duties, "making it difficult to depend on him." (Mendez Depo. Ex. 17, Dkt. 48-8 at 6-7.) The evaluation advises Mendez to improve his communication and teamwork with his coworkers. In particular, the evaluation states Mendez should discuss concerns with his manager rather than using other staff members as a "sounding board." (*Id.* at 8.)

On June 23, 2010, Mendez emailed Brahe, SARMC's Chief Operating Officer, requesting that the May 18 written warning, May 25 Disciplinary Action Record, and certain comments in the June 17 performance evaluation be "cleared" from his employment record. (Mendez Depo., Ex. 18, Dkt. 48-8 at 14.) In the email, Mendez opines that "staff at [SARMC] Iowa are treated differently and there does seem to be different rules for different people and this in turn lowers employee morale." (*Id*. at 16.) Mendez also acknowledges in the email that he repeatedly refused to perform additional lab duties "because . . . there is a lack of teamwork and proper organization at this clinic." (*Id.* at 18.) On July 20, 2010, Mendez and Brahe met to discuss his concerns.

Brahe summarized their July 20 meeting in a letter to Mendez dated July 26, 2010. Although Brahe refused to remove any documentation or redact any information from Mendez's employment record, she counseled Mendez on how he could improve his employment record going forward. Brahe indicated that "a positive attitude, teamwork, and satisfactory performance as a radiology tech that provides other duties as assigned, will make the recent performance appraisal and discipline less of an issue." (Mendez Depo., Ex. 19, Dkt. 48-8 at 20.)

Between late July and early October of 2010, SARMC experienced several issues regarding Mendez's conduct and performance. On July 27, Croft verbally counseled Mendez about his continued unwillingness to assist with duties outside of the radiology department, his poor communication with supervisors, and the fact that he stayed at the clinic after clocking out. On August 6, McDowell reported to Croft that Mendez recently had made several inappropriate remarks, including chiding another coworker about that coworker's religion. On September 15, Allen verbally counseled Mendez on time management because Mendez was taking more than double the time ordinarily required to process DXA scans.

Mendez also refused to perform autoclaving—essentially, the sterilization of medical equipment—during this period. On July 22, 2010, two days after Mendez met with Brahe, Croft asked Mendez to complete a skills competency checklist. According to Croft, the purposes of the checklist were to identify Mendez's additional duties outside the radiology department and determine whether he was comfortable with those duties. Mendez was generally comfortable with the listed duties or indicated he could become

comfortable with additional training. However, the reasons Mendez gave for refusing to perform autoclaving were that he not trained on the procedure and he believed the task was more appropriate for a nurse or medical assistant. Although his managers determined in early October of 2010 that autoclaving would not be one of Mendez's assigned duties, on July 22, Croft specifically instructed Mendez not to ask other SARMC radiology technicians whether they were required to perform autoclaving.

But, on October 5, Mendez sent emails inquiring about autoclaving to two radiology technicians at other SARMC clinics. One responded that she did not perform autoclaving, and the other responded that he sometimes performed autoclaving and advised Mendez to be more flexible with respect to his job duties. Then, on October 6 and 7, Mendez during working hours sent several replies to the same two technicians. Among other things, Mendez stated "I guess that I'll end up getting fired since I have no intention of doing autoclaving." (Mendez Depo. Ex. 24, Dkt. 48-8 at 28.) And, in an October 6 email to one of the technicians, Mendez disparaged Croft's leadership qualities and opined the technician "work[s] in a much better environment with management that actually knows what they are doing." (*Id.*)

After Mendez's October email exchanges with the technicians came to the attention of Mendez's supervisors, Clinic Manager Allen decided to terminate Mendez's employment with SARMC. On October 15, 2010, Allen terminated Mendez's employment "because of his unsatisfactory work performance, including: (1) his continued negative comments about co-workers despite multiple written warnings; (2) his continued violation of other express instructions from management; (3) his refusal to

perform assigned work and refusal to assist coworkers; and (4) general performance issues, including wasting time on email and taking too long to perform his work." (Allen Dec. ¶ 17, Dkt. 48-4 at 4-5.)

## 2.    Procedural History

Following termination of his employment with SARMC, Mendez filed a charge of discrimination with the Idaho Human Rights Commission and the Equal Employment Opportunity Commission. Both Commissions issued Notice of Right to Sue letters to Mendez, after which Mendez filed this lawsuit in January of 2012.

The Court allowed Mendez's original attorneys to withdraw from the case in January of 2013. Among other issues, counsel cited strained and difficult communication with Mendez and Mendez's refusal to cooperate in the discovery process. Following a protracted process during which Mendez disputed the propriety of counsel's withdrawal and later stated his intention to proceed pro se, new counsel appeared on Mendez's behalf in early June of 2013. Discovery proceeded through the end of 2013, and SARMC filed the instant motion for summary judgment on January 15, 2014.

About one week later, Mendez filed a motion to compel disclosure of records related the OIP investigation of his May 7, 2010 complaint about Miller. The Court deferred consideration of SARMC's motion for summary judgment pending resolution of the motion to compel. Then, in early February of 2014, Mendez's second attorney of record sought to withdraw, which the Court allowed. Thereafter, Mendez appeared pro se. Finding the OIP investigation file protected from disclosure by the attorney-client

privilege and the work product doctrine the Court, on July 10, 2014, denied Mendez's

motion to compel and reopened briefing on SARMC's motion for summary judgment.

On July 28, 2014, Mendez filed an unsworn and unnotarized Affidavit in

Opposition to Defendant's Motion for Summary Judgment along with various exhibits

(Dkt. 72). SARMC filed a reply brief and numerous objections to Mendez's opposition

filings on August 13. Two days later, Mendez filed an objection to SARMC's reply,

arguing it was untimely. On August 28, 2014, the Court heard oral argument on

SARMC's motion for summary judgment, and this matter is now ripe for resolution.

## STANDARD OF REVIEW

One of the key purposes of summary judgment "is to isolate and dispose of

factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

(1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by

which factually insufficient claims or defenses [can] be isolated and prevented from

going to trial with the attendant unwarranted consumption of public and private

resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment;

the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party,

*id*. at 255, and the Court must not make credibility findings.  *Id*. Direct testimony of the

non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152,

1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable

inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). This shifts the burden to the nonmoving party to produce evidence sufficient to support a jury verdict in his favor. *Id*. at 256-57. The nonmoving party must go beyond the pleadings and show "by [his] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.2001) (quoting F*orsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

SARMC's motion for summary judgment seeks dismissal of Mendez's federal and state employment discrimination claims, as well as his state contract claim. The Court

will first address the parties' objections to each other's filings before delving into the merits of this dispute.

## 1.    The Parties' Objections to the Summary Judgment Filings

### A.    Mendez's Objection to SARMC's Reply

Mendez objects to SARMC's reply brief on the ground that it is untimely under the Federal Rules of Civil Procedure. However, it appears he has overlooked Rule 6(d).

"When a party may or must act within a specified time after service and service is made Rule 5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a)." Fed. R. Civ. P. 6(d). Rule 5(b)(2)(C) allows service by mail to a person's last known address, and Rule 5(b)(2)(E) authorizes service by electronic means such as the Court's CM/ECF system. In addition, District of Idaho Local Civil Rule 7.1(b)(3) allows 14 days for filing of a reply brief after service of the nonmoving party's response. Read together, these rules provide the moving party 17 days to file a reply when the nonmoving party serves his response by mail or through the CM/ECF system.

Mendez served his opposition materials on SARMC's counsel electronically and by mail on July 28, 2014. SARMC's reply was due August 14, was filed on August 13, and is timely.

### B.    SARMC's Objections to Mendez's Opposition Filings

In a nine-page appendix to its reply brief, SARMC raises three general objections to Mendez's response to its motion for summary judgment. (Dkt. 74-1.) First, SARMC contends the Court should not consider any of Mendez's opposition filings because they do not comport with Local Rule 7.1(c)(2). Second, SARMC argues Mendez's "affidavit"

should be stricken from the record because it is neither sworn nor signed under penalty of perjury. Third, SARMC claims certain statements in Mendez's affidavit are inadmissible under the rules of evidence.

Pro se litigants are "subject to the same rules of procedure and evidence as defendants who are represented by counsel." *United States v. Merrill*, 746 F.2d 458, 465 (9th Cir. 1984). In this regard, it bears mentioning that SARMC presents its objections in a nine-page appendix, which is almost double the length allowed for such filings under Local Rule 7.1(d)(1). Mendez is not the only party to overlook applicable procedural rules.

With respect to SARMC's first objection, it is true that Local Rule 7.1(c)(2) requires "the responding party [to] also file a separate statement, not to exceed ten (10) pages, of all material facts which the responding party contends are in dispute." The Court gave Mendez notice of this and the other applicable requirements the same day it allowed briefing on the motion for summary judgment to continue. (Dkt. 71.) Rather than follow these instructions, Mendez filed a single "affidavit" with no separate statement of disputed facts. Of course, Mendez's technical violation of a local rule is not sufficient to grant summary judgment in favor of SARMC. *See Marshall v. Gates*, 44 F.3d 722 (9th Cir. 1995).

But, as SARMC notes in its second objection, Mendez's "affidavit" is not in the proper form. "An affidavit is a sworn declaration, normally attested to before a notary public, stating certain facts under oath." *Correa-Rivera v. Holder*, 706 F.3d 1128, 1131 (9th Cir. 2013) (quoting Black's Law Dictionary 62 (8th ed. 2004)). It is the oath that

distinguishes an affidavit from a mere assertion of fact. Mendez's "affidavit" is not notarized and does not purport to be made under oath. Nor does Mendez's "affidavit" qualify as a declaration under 28 U.S.C. § 1746, because it is not signed under penalty of perjury. Thus, the Court cannot treat Mendez's filing as an affidavit or declaration. Instead, the Court will liberally construe the filing as Mendez's brief—that is, argument rather than evidence—in opposition to summary judgment. *See, e.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (directing courts to liberally construe pro se filings).

The Court also will consider the exhibits Mendez attached to his opposition. In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because, at trial, plaintiff's testimony of contents would not be hearsay). The Court finds the exhibits to Mendez's opposition—consisting of letters, email chains, deposition excerpts, and documents—are either admissible or their contents could be presented in an admissible form that may be considered at the summary judgment stage.

When Mendez's opposition filings are viewed in this manner, the Court finds that SARMC's over-long list of evidentiary objections needs not be resolved—with one exception the Court addresses below in the context of Mendez's retaliation claim. *See infra* Part 2.C, n.13 and accompanying text. Counsel for SARMC acknowledged as much

during oral argument. Nevertheless, statements in Mendez's "affidavit" that contradict his

sworn deposition testimony will not be viewed as creating a genuine issue of material

fact.[4] *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 797 (1999). And, to the

extent Mendez's factual arguments are not specifically tied to evidence in the record, the

Court will disregard them because it is Mendez's affirmative obligation to identify

evidence that would preclude summary judgment. *Carmen*, 237 F.3d at 1031("The

district court need not examine the entire file for evidence establishing a genuine issue of

fact, where the evidence is not set forth in the opposing papers with adequate references

so that it could conveniently be found.").

## 2.    **Title VII Claims**

Title VII of the Civil Rights Act of 1964 provides remedies to employees injured

by the discriminatory conduct of employers. Under Title VII, it is unlawful for an

employer to discriminate against an employee "because of" the employee's "race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). This prohibition covers

discriminatory discharge decisions, as well as decisions related to "compensation, terms,

conditions, or privileges of employment." *Id.*  Title VII also prohibits an employer from

retaliating against an employee because the employee "opposed" unlawful employment

discrimination or "made a charge, testified, assisted, or participated in any manner in an

---

[4]      For example, Mendez claims the May 7 disciplinary meeting with Miller did not occur,
(Dkt. 72 at 4), and that "Croft would laugh about [discriminatory comments made by Miller] or
make similar remarks." (*Id.*) Both of these assertions are contradicted by Mendez's deposition
testimony. (Mendez Depo. 55:7-56:1 (discussing content of May 7 meeting with Miller); 146:24-
147:1 (denying that Croft made comments about Mendez's race or national origin), Dkt. 48-7 at
16; 39.)

investigation, proceeding, or hearing" under Title VII. *Id.* § 2000e-3(a). In addition, the

Supreme Court has held that "[w]hen the workplace is permeated with discriminatory

intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment, . . .

Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal

quotation marks and citations omitted).

Mendez claims SARMC violated Title VII in three ways. First, he alleges that

SARMC intentionally treated him differently than other employees due to his affiliation

with the LDS Church or his Hispanic race.[5] Second, Mendez claims Miller and Croft's

conduct toward him was racially or religiously based harassment that created a hostile

work environment. Third, Mendez argues SARMC unlawfully retaliated against him after

he reported Miller's discriminatory conduct to the OIP. The Court addresses each claim

below. [6]

---

[5]  Mendez also claims discrimination based on his "Hispanic national origin." (Am. Compl. ¶ 44, Dkt. 5.) However, "Hispanic" does not refer to a particular country. The Ninth Circuit has observed that "a claim that [the plaintiff] was discriminated against because he was Hispanic is actually a race based claim." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 n.20 (9th Cir. 2003). Apart from the evidence related to Mendez's race discrimination claim, there is no evidence of national origin discrimination. In fact, the parties' briefing does not even reference the nation from which Mendez originates. Accordingly, the Court finds Mendez's race discrimination claim subsumes his national origin claim.

[6]  The Idaho Supreme Court has held that the same standards of proof applicable to Title VII actions apply to actions under the Idaho Human Rights Act. *Bowles v. Keating*, 606 P.2d 458, 462 (Idaho 1979); *see also Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) ("[O]ur analysis of Peterson's religious discrimination claims under the Idaho Human Rights Act is the same as under Title VII."). The Court does not separately analyze Mendez's Idaho Human Rights Act claims, as those claims turn on the same facts and law as Mendez's Title VII claims.

## A.    Disparate Treatment on the Basis of Race or Religion

To prove discrimination on the basis of race or religion, Mendez must introduce evidence from which a reasonable jury could conclude, in light of common experience, that it was more likely than not that SARMC's adverse action was motivated by consideration of his race or religion. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) (explaining plaintiff's burden under Title VII is to demonstrate that defendant's proffered explanation for an adverse action is more likely than not a pretext for discrimination); *U.S. Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711, 715 (1983) ("The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff.") (quotations omitted). When evaluating discrimination claims at the summary judgment stage, the courts employ the familiar burden-shifting analysis developed in *McDonnell Douglas*. *See Pottenger v. Potlatch Corp*., 329 F.3d 740, 745 (9th Cir. 2003).

Under *McDonnell Douglas*, an employee alleging disparate treatment must first establish a prima facie case of discrimination. 411 U.S. at 802. If Mendez establishes a prima facie case, "the burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged actions." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If the employer meets this burden, the burden of production shifts back to the employee to show the employer's reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't*

*of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Throughout the burden-shifting process, the employee has the burden of persuading the trier of fact that the employer intentionally discriminated against the plaintiff. *Douglas v. Anderson*, 656 F.2d 528, 531 (9th Cir. 1981) (citing *Burdine*, 450 U.S. at 256).

In other words, "[t]o survive summary judgment on his disparate treatment claim, [Mendez] must establish that his job performance was satisfactory and provide evidence, either direct or circumstantial, to support a reasonable inference that his termination [or discipline] was discriminatory." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

### i.  *Prima Facie Case*

To establish a prima facie case of disparate treatment, Mendez must show that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id*.  There is no dispute that the first two elements are satisfied in this case.

As for the third element, SARMC does not dispute that both Croft and Allen were responsible for adverse employment actions against Mendez. Croft issued Mendez a formal Disciplinary Action Record on May 25, 2010, and Allen decided to terminate Mendez's employment in October of 2010. However, SARMC's briefing does not address whether Miller was also responsible for adverse employment actions when she gave Mendez a verbal warning on May 7, 2010, and then, on May 18, provided Mendez a

written summary of that warning. During oral argument, counsel for SARMC claimed Miller's warnings were not adverse employment actions because they were informal and did not change the conditions of Mendez's employment. This argument is inconsistent with Ninth Circuit law.

The Ninth Circuit takes an expansive view of the term "adverse employment action." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004). The term includes transfers of job duties, negative performance reviews, actions that affect an employee's compensation, and warning letters. *Id*. (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)). Accordingly, the Court finds that Miller's May 7 verbal warning and her May 18 written warning—both of which focused on the need for Mendez to improve his job performance, obey managers' instructions, and avoid negative or inappropriate communication with coworkers—constitute adverse employment actions. And, as detailed below, the Court finds these two warnings cannot be separated from the ultimate adverse action taken against Mendez—termination of his employment—although different decision-makers were involved along the way.

With regard to the fourth element, the Court is mindful that the amount of proof necessary to establish a prima facie case "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). While Mendez provides no evidentiary basis for comparing his treatment to that of similarly situated non-LDS or non-Hispanic SARMC employees, he does point to circumstances that support an inference of discrimination. At the summary judgment stage, the Court must accept as true Mendez's account that Miller made discriminatory

comments aimed at Mendez's Hispanic race and at the LDS Church and its members.[7]

Although the Court finds these alleged statements are legally insufficient to raise a

genuine issue of fact on Mendez's hostile work environment claim, as discussed below,

they do support the inference that Miller harbored some hostility towards Mendez

because of his race and religion.

Moreover, Miller disciplined Mendez by issuing verbal and written warnings

about his behavior at work. Her warnings are the beginning of a string of disciplinary

actions that ended on October 15, 2010, when Allen decided to terminate Mendez's

employment. In fact, Miller warned Mendez on May 7 and again on May 18 about three

behaviors similar to those that prompted Allen's termination decision five months later.[8]

Likewise, Croft's disciplinary actions—including the May 25 Disciplinary Action Record

and the partially negative performance evaluation completed on June 17—reference

Miller's warnings and thus effectively continue the disciplinary process initiated by

Miller. In other words, Miller's warnings set the stage for all of SARMC's later

---

[7]     It is not clear whether Miller knew or had reason to believe that Mendez was a member
of the LDS Church. SARMC emphasizes that Croft and Allen did not know Mendez's religion
and that Mendez never personally revealed his religion to Miller. However, Mendez disclosed
his religious affiliation to an LDS coworker, Beverly Tremaine. (Mendez Depo. 73:11-13, Dkt.
48-7 at 20.) Thus, one could reasonably infer Miller learned of Mendez's religion through
Tremaine or others, or harbored a belief that he was LDS. Because Mendez is the nonmoving
party, the Court will draw this inference in his favor.

[8]     In May of 2010, Miller warned Mendez verbally and in writing to (1) refrain from
making negative comments about coworkers, (2) accept directions in a cooperative manner, and
(3) speed up his processing of x-rays and DXA scans. (Mendez Depo., Ex. 10, Dkt. 48-7 at 67.)
Among the reasons for Allen's decision to terminate Mendez's  employment were Mendez's (1)
"continued negative comments about coworkers," (2) "continued violation of . . . express
instructions from management," and (3) "taking too long to perform his work." (Allen Dec. ¶ 17,
Dkt. 48-4 at 4-5.)

disciplinary actions against Mendez. Although there is minimal evidence of Miller's motivation for issuing the warnings, a rational trier of fact could conclude, based on Miller's discriminatory remarks, that racial or religious animus infected her decision to discipline Mendez. This inference is sufficient to establish Mendez's prima facie case for disparate treatment on the basis of race and religion under the standards applicable to Rule 56 motions.

### ii. *Legitimacy of SARMC's Explanation*

But Mendez's prima facie showing does not end the Court's inquiry. Moving to the next stage of the analysis, the burden shifts to SARMC to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Rose v. Wells Fargo & Co.*, 902 F.2d. 1417, 1420 (9th Cir. 1990). To suffice under *McDonnell Douglas*, SARMC's evidence must explain why Mendez "in particular" was subject to adverse employment action. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1211(9th Cir. 2008) (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008)). Performance-related concerns are sufficient to rebut the presumption of discriminatory intent, *Pottenger*, 329 F.3d at 746, as is evidence that an employee disobeyed a direct order from a supervisor. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).

SARMC articulates several legitimate, nondiscriminatory reasons for disciplining Mendez, all of which have support in the record. It is undisputed that Mendez made negative comments to coworkers about other coworkers and managers. It is also undisputed that he attempted to address perceived workplace problems outside his chain

of command—in direct violation of managers' specific instructions. On July 22, 2010, for instance, Croft warned Mendez not to contact other radiology technicians to determine whether they were required to perform autoclaving, an assigned task that Mendez refused to perform. Mendez did not comply.

Rather, in early October of 2010, he not only emailed two other radiology technicians about autoclaving, but he also used one of them as a sounding board for complaints about Croft's leadership. By doing so, Mendez disobeyed at least four express instructions from management: (1) Miller's May 7 warning to avoid negative communications with coworkers; (2) Miller's May 18 instruction to address concerns through the chain of command; (3) the note in Mendez's June 17 performance evaluation to not use other staff as a sounding board; and (4) Croft's July 22 warning.[9] Even if racial or religious animus tainted Miller's disciplinary decisions, Mendez's clear insubordination after Miller's June 1 resignation establishes a legitimate, nondiscriminatory reason for SARMC's adverse disciplinary action.

SARMC also offers performance-related reasons for its decision to terminate Mendez's employment. Miller, Croft, and Allen all noted that Mendez worked at a slower-than-expected pace while producing x-rays or DXA scans. Mendez admits "there would be some minor delays when a single person is covering multiple jobs at the same time." (Dkt. 72 at 5.) But he argues that other Iowa Clinic staff caused the delays by ordering x-rays while Mendez was working in another area. Although Mendez presents

---

[9]     This conduct was also contrary to the written counseling Mendez received from Chief Operating Officer Brahe on July 26. (*See* Mendez Depo., Ex. 19, Dkt. 48-8 at 20.)

evidence that other Iowa Clinic staff did not always follow scheduling protocols meticulously, that does not disprove his supervisors' concerns about his slow pace. And, even if Mendez's evidence creates a genuine dispute as to whether his job performance was satisfactory, there is no genuine dispute with respect to his insubordination and negative communications with coworkers. Therefore, SARMC has articulated legitimate, nondiscriminatory reasons for disciplining Mendez and for terminating his employment.

### iii. *Pretext*

Given SARMC's showing, Mendez must raise a genuine issue of material fact concerning whether SARMC's articulated reasons for its adverse employment actions are pretextual to discrimination. *Diaz*, 521 F.3d at 1212. Mendez may demonstrate pretext by producing either direct or circumstantial evidence that SARMC's adverse employment actions were "due in part or in whole to discriminatory intent." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004). Although "very little" direct evidence is necessary, a plaintiff must present "specific" and "substantial" circumstantial evidence of pretext to raise a genuine issue of material fact. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221-22 (9th Cir. 1998).

Here, Mendez presents no direct evidence of discriminatory motive and his only circumstantial evidence of pretext is the same evidence that supports his prima facie case—Miller's comments about members of the LDS Church and her specific comments about Mendez's odor and diet. "[T]he mere existence of a *prima facie* case, based on the minimum evidence necessary to raise a *McDonnell Douglas* presumption, does not preclude summary judgment." *Wallis*, 26 F.3d at 890. Standing alone, Miller's

comments do not suggest her stated, nondiscriminatory reasons for disciplining Mendez were mere pretext. And Miller's comments do not rebut Croft's and Allen's stated reasons for their disciplinary actions, several of which mirrored Miller's concerns.

Mendez does not dispute that he made negative comments to coworkers about other coworkers and managers, refused to perform duties in the laboratory, and disobeyed orders from his supervisors. Instead, he attempts to excuse this conduct by claiming he was "reported" by McDowell because of unspecified "ulterior motives" or that he was too busy to assist in the laboratory. There is no evidence in the record to substantiate these excuses, nor do they undercut SARMC's articulated reasons for disciplining and ultimately discharging Mendez. Mendez presents no other direct or circumstantial evidence to suggest that his race or religion was a motivating factor behind SARMC's adverse employment actions.

Mendez also argues that, because SARMC noted no performance-related issues in his personnel file before May of 2010, its disciplinary actions against him must be pretext for discrimination. However, Mendez "may not defeat [SARMC]'s motion for summary judgment merely denying the credibility of [SARMC]'s proffered reason . . . [or] by relying solely on [his] subjective belief that the challenged employment action was unnecessary or unwarranted." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 n.6 (9th Cir. 2006). While the written record discloses no job performance concerns prior to Miller's May 7 warning, it does show that Mendez began refusing to perform assigned duties as early as November of 2009—when Mendez emailed Vejar, refusing to perform duties in the lab "until issues with organization and teamwork have been sorted

out." (Mendez Depo., Ex. 26, Dkt. 48-8 at 33.) And, critically, there is no dispute that Mendez disobeyed his supervisors' explicit instructions after Croft warned him on May 25, 2010, that continued insubordination would result in immediate termination. After carefully considering the record, the Court finds no reasonable fact-finder could conclude that SARMC's adverse employment actions were actually motivated in whole or in part by Mendez's Hispanic race or his LDS religion.

## B. Hostile Work Environment

Mendez also claims SARMC subjected him to racially or religiously based harassment that created a hostile work environment. To prevail on his hostile work environment claim, Mendez must show: "(1) that he was subjected to verbal or physical conduct of a racial or [religious] nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). In particular, Mendez must prove that the environment at the Iowa Clinic was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). There is no dispute that Mendez found certain comments made by Miller unwelcome and subjectively offensive. The issue is whether the conduct was so severe or pervasive that a fact-finder could reasonably conclude Mendez was subjected to an abusive work environment.

To determine whether Mendez's work environment satisfies this objective test, the Court must examine "all the circumstances" of his environment at the Iowa Clinic. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Among the key factors are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. However, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not amount to a hostile work environment because Title VII is not intended to be a "general civility code." *Faragher*, 524 U.S. at 788. Instead, the complained-of conduct "must be *extreme* to amount to a change in the terms and conditions of employment." *Id.* (emphasis added).

The only indicia of offensive conduct at the Iowa Clinic are Mendez's reports that the former Clinic Manager, Miller, made racially and religiously offensive remarks about Mendez or others. As for Mendez's allegation that Croft also made racially discriminatory comments, there is no evidence to support this claim. To the contrary, Croft flatly denied the allegation during her deposition. (Croft Depo. 158:2-19, Dkt. 48-9 at 14.) Mendez presents no specific evidence that any SARMC employee besides Miller made racially or religiously offensive comments to him or others.

While the Court accepts at this stage Mendez's contention that Miller made such offensive comments multiple times, Mendez provides no context that would allow the Court to determine when, where, to whom, or how often Miller made such remarks. It is, however, clear that the offensive comments ended by May 7, 2010, as Mendez conceded during oral argument. And it is undisputed that Mendez did not note any offensive

comments during the five months between May 7 and SARMC's termination of his employment in October of 2010.

The Ninth Circuit has rejected hostile work environment claims in cases involving conduct more egregious than any alleged here. In *Vasquez*, for instance, the court found no hostile work environment where a Hispanic probation officer's supervisor stated the officer has "a typical Hispanic macho attitude" and told the officer to consider a field job because "Hispanics do good in the field." 349 F.3d at 643. Like Mendez, Vasquez claimed his supervisor continually harassed him, but, because he presented evidence of only a few isolated incidents over the course of more than one year, the court found the conduct was not sufficiently severe or pervasive. Similarly, in *Sanchez v. City of Santa Ana*, the court determined that no reasonable jury could find the plaintiff Latino police officers experienced a hostile work environment despite allegations that the employer selectively enforced rules against Latinos, made racially offensive slurs, posted a racially offensive cartoon, characterized minority officers as "super-sensitive," assigned unsafe vehicle to Latino officers, and refused to send adequate police back-up for Latino officers. 936 F.2d 1027 (9th Cir. 1990). By contrast, the court found an objectively hostile work environment where an employee experienced an "unrelenting barrage of verbal abuse" at least weekly and often several times a day. *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001).

Moreover, the complete cessation of offensive comments after Miller resigned undercuts Mendez's hostile work environment claim. *See Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 537 (7th Cir. 1993) ("Of course, once Richardson was gone, any behavior

that might arguably have rendered Saxton's work environment intolerable was terminated."); *Trujillo v. City of San Leandro*, 2010 WL 3063164, *6 (N.D. Cal. Aug. 1, 2010) (concluding plaintiff failed to state a prima facie case of harassment because of the "short duration of the conduct" and "the fact that Defendant ceased using the name upon being informed that Plaintiff objected to it"). Far from establishing a persistent barrage of verbal abuse, or even a single instance of severe offensive conduct, the record contains a handful of isolated, racially and religiously offensive remarks made by a supervisor who resigned several months before Mendez's employment ended. After reviewing the record in the light most favorable to Mendez, the Court finds that no reasonable jury could conclude Miller's infrequent, albeit insensitive and unprofessional, remarks were so extreme that they altered the conditions of Mendez's employment.

## C. Retaliation

Mendez's last Title VII claim is that SARMC retaliated against him for reporting Miller's discriminatory remarks to human resources and through the OIP. Noting a close temporal correlation, Mendez argues SARMC first initiated disciplinary actions against him shortly after he reported his concerns about Miller.

The *McDonnell Douglas* burden-shifting framework also applies to Mendez's retaliation claim. *Yartzoff v.Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987). To establish a prima facie case for retaliation, Mendez must "show that [he] engaged in a protected activity, that [he] suffered a materially adverse action, and that there was a causal relationship between the two." *Westendorf v. W. Coast Contactors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

57 (2006)). "An employee engages in protected activity when [he] opposes an employment practice that either violates Title VII or that the employee reasonably believes violates the law." *Id.* Here, Mendez engaged in protected activity by reporting concerns about Miller's allegedly discriminatory conduct to Vejar in late 2009[10] and to the OIP on May 7, 2010. Additionally, it is undisputed that Mendez suffered a materially adverse action when SARMC disciplined him and later terminated his employment.

Even so, Mendez must show that his protected conduct was a "but-for cause—but not necessarily the only cause—of [his] termination." *Id.* Under the "but-for" standard, Mendez must establish that the discipline or termination of his employment "would not have occurred in the absence of—that is, but for—[Mendez's complaint about Miller's racially and religiously offensive comments.]" *Univ of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). While "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity," the adverse employment action must come "'fairly soon after the employee's protected expression.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (quoting *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009-10 (7th Cir. 2000)). In addition, the requisite causal link exists only if the plaintiff makes "some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had

---

[10] Although Mendez's retaliation claim is unclear in this regard, the Court liberally construes the claim to include alleged retaliation for Mendez's late 2009 verbal report to Vejar about Miller's discriminatory comments. But the late 2009 report constitutes an independent basis for a retaliation claim only if Mendez establishes it was a "but-for" cause of Miller's May 7, 2010 verbal warning—the only disciplinary action to take place before Mendez's OIP complaint. After May 7, any retaliation for the 2009 report would be indistinguishable from retaliation for the OIP complaint.

engaged in protected activity." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (citing *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).

As Mendez points out, the timing of SARMC's disciplinary actions correlates with the timing of his protected activities. With respect to Mendez's late 2009 report to Vejar, at least five months elapsed between the report and SARMC's first disciplinary action— Miller's May 7, 2010 verbal warning. Further, Mendez received a written warning from Miller, a formal disciplinary write-up from Croft, and a partially negative performance evaluation from Croft within weeks of his OIP complaint.[11] Additional adverse actions, including Chief Operating Officer Brahe's refusal to clear Mendez's employment record and Clinic Manager Allen's decision to terminate Mendez's employment, followed within five months of the OIP complaint. In some retaliation cases, causation has been inferred when an adverse employment action occurs within a few months of a protected activity. *See Villiarimo*, 281 F.3d at 1065 (collecting cases).

However, temporal correlation does not imply causation in this case. That is because the decision-makers responsible for the adverse employment actions were not aware of Mendez's protected activities. *See Raad*, 323 F.3d at 1197. Although the Court accepts Mendez's contention that he verbally reported Miller's discriminatory remarks to Vejar in late November of 2009, she was not responsible for any adverse actions and

---

[11] In fact, Miller's May 18 written warning and Croft's May 25 disciplinary write-up were issued during the OIP investigation triggered by Mendez's complaint. Croft's performance June 17 evaluation followed just weeks after Miller resigned in lieu of discharge on June 1, 2010.

there is no evidence she told anyone about the report.[12]  Similarly, there is no evidence

that any decision-maker knew of Mendez's OIP complaint, because both Mendez and

SARMC kept the complaint and the resulting investigation confidential.

Nevertheless, Mendez urges the Court to assume that SARMC's managers and all

of its Human Resources personnel knew about his OIP complaint.[13] There is no question

that SARMC personnel outside the Iowa Clinic knew of, and conducted an investigation

based on, Mendez's OIP complaint. But there is no reasonable basis for inferring that any

of the relevant decision-makers knew about it. To the contrary, the record indicates that

SARMC insulated the decision-makers from knowledge of Mendez's complaint and the

investigative findings. The Court found as much when it determined that SARMC had

not waived the attorney-client privilege and work product protections applicable to the

investigative file and Mendez's OIP complaint. (Dkt. 66 at 7-8.)

Mendez also asserts that Allen must have known of the OIP complaint simply

because he worked in SARMC's Human Resources department before becoming the

Iowa Clinic Manager in August of 2010. This assertion constitutes "[c]onclusory,

speculative testimony" that is "insufficient to raise genuine issues of fact and defeat

summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.

---

[12]    Citing "exhibit 4, 8 pages," Mendez asserts: "The events prove that not only Judi Vejar,
but HR were aware of my complaints even before the OIP investigation." (Dkt. 72 at 4.) There is
no Exhibit 4 in Mendez's filings. Lacking an intelligible connection to the record, the assertion
above is not evidence that Vejar told anyone about his late 2009 verbal report.

[13]    As mentioned in connection with SARMC's evidentiary objections, SARMC specifically
objects to such an inference. SARMC argues the inference is unwarranted because there is no
evidentiary foundation for it and Mendez lacks personal knowledge about what SARMC's
managers and Human Resources personnel did or did not know.

2007). Moreover, the assertion is contradicted by Allen's sworn statement that he has never seen Mendez's OIP complaint and had no knowledge of its existence or its contents when he decided to terminate Mendez's employment. (Allen Dec. ¶ 22, Dkt. 48-4 at 6.)

Despite the temporal correlation between Mendez's discrimination complaints and SARMC's disciplinary actions, the record establishes that the relevant decision-makers were not aware of Mendez's protected activities. The essential causal link is absent. And, even if timing alone could establish Mendez's prima facie case of retaliation, SARMC articulates several legitimate, non-retaliatory reasons for its disciplinary actions. Temporal proximity alone does not defeat summary judgment at the pretext stage of the analysis, *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 847 (2d Cir. 2013), and Mendez presents no additional evidence of pretext to rebut SARMC's showing. Thus, no genuine issue of material fact exists to preclude summary judgment on Mendez's retaliation claim.

### 3.     Implied Covenant of Good Faith and Fair Dealing

Mendez's final claim is that SARMC breached the covenant of good faith and fair dealing implicit in his employment contract by retaliating against him for reporting unlawful discrimination. However, Mendez neither argues this claim nor does he identify the terms of his employment contract with SARMC.

Under Idaho law, the covenant is implied into every employment contract, but it does not "create a duty for the employer to terminate [an at-will] employee only for good cause." *Metcalf v. Intermountain Gas Co.*, 778 P.2d 744, 749 (Idaho 1989) (quoting *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1040 (Ariz. 1985)). Rather, a

breach of the covenant occurs only through an action that "violates, nullifies or significantly impairs any benefit or right which either party has in the employment contract, whether express or implied . . . ." *Id.*

Mendez's implied covenant claim fails for at least two reasons. First, he cannot establish a claim for unlawful retaliation. If, as the record demonstrates, SARMC did not unlawfully retaliate against Mendez, there is no basis for arguing that SARMC violated Mendez's contractual right, if any, to be free from retaliation while employed by SARMC. Simply put, Mendez cannot save his retaliation claims by dressing it as a contract issue.

Second, it is well-established that, "in the absence of an agreement between the employer and the employee limiting the employer's (or the employee's) right to terminate the contract at will, either party to the employment agreement may terminate the relationship at any time or for any reason without incurring liability." *Id*. at 746 (citing *MacNeil v. Minidoka Mem'l Hosp.*, 701 P.2d 208 (Idaho 1985)). Mendez does not argue, let alone present evidence, that he was anything but an at-will employee. As such, he cannot establish a breach of the implied covenant simply because he disagrees with SARMC's reasons for terminating his employment. Therefore, Mendez's implied covenant claim fails as a matter of law.

## CONCLUSION

Mendez presented insufficient evidence to survive summary judgment. While Mendez's minimal evidence supports an inference of disparate treatment, no rational fact-finder could conclude that SARMC's reasons for disciplining and discharging Mendez

were pretext for racial or religious discrimination. Nor could a rational fact-finder conclude that he established a prima facie case of hostile work environment or retaliation. Mendez's claims under the Idaho Human Rights Act are indistinguishable from and thus fail for the same reasons as his Title VII claims. In addition, Mendez's implied covenant claim fails as a matter of law. Accordingly, the Court will recommend that summary judgment be granted on all of Mendez's claims.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED** that Defendant's Motion for Summary Judgment (Dkt. 48) be **GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **September 12, 2014**

Honorable Candy W. Dale
United States Magistrate Judge