# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RAUL MENDEZ,<br><br>              Plaintiff,<br><br>    v.<br><br>ST. ALPHONSUS REGIONAL<br>MEDICAL CENTER, INC.,<br><br>              Defendant. | Case No. 1:12-CV-00026-EJL-CWD<br><br>**ORDER ADOPTING REPORT<br>AND RECOMMENDATION** |

      Chief United States Magistrate Judge Candy W. Dale issued a Report and Recommendation in this matter. (Dkt. 78.) Pursuant to 28 U.S.C. § 636(b)(1), the parties had fourteen days in which to file written objections to the Report and Recommendation. Objections and responses to the objections were filed by the parties. The matter is now ripe for the Court's consideration.

## DISCUSSION

      Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge.  Where the parties object to a report and recommendation, this Court shall make a de novo determination of those portions of the report which objection is made. *Id*. Where, however, no objections are filed the district court need not conduct a de novo review. In

*United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003), the court interpreted

the requirements of 28 U.S.C. § 636(b)(1)(C):

> The statute [28 U.S.C. § 636(b)(1)(C)] makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise. As the *Peretz* Court instructed, "to the extent de novo review is required to satisfy Article III concerns, it need not be exercised unless requested by the parties." *Peretz*, 501 U.S. at 939 (internal citation omitted). Neither the Constitution nor the statute requires a district judge to review, de novo, findings and recommendations that the parties themselves accept as correct. *See Ciapponi*, 77 F.3d at 1251 ("Absent an objection or request for review by the defendant, the district court was not required to engage in any more formal review of the plea proceeding."); *see also Peretz*, 501 U.S. at 937-39 (clarifying that de novo review not required for Article III purposes unless requested by the parties) . . . .

*See also Wang v. Masaitis*, 416 F.3d 993, 1000 & n.13 (9th Cir. 2005). Furthermore, to

the extent that no objections are made, arguments to the contrary are waived. *See* Fed. R.

Civ. P. 72; 28 U.S.C. § 636(b)(1) (objections are waived if they are not filed within

fourteen days of service of the Report and Recommendation). "When no timely objection

is filed, the Court need only satisfy itself that there is no clear error on the face of the

record in order to accept the recommendation." Advisory Committee Notes to Fed. R.

Civ. P. 72 (citing *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th

Cir.1974)).  In this case, the objections were filed so the Court is required to conduct a de

novo determination of the Report and Recommendation.

# FACTUAL BACKGROUND

Plaintiff Raul Mendez filed a pro se Complaint on January 20, 2012 alleging he was discriminated in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 200e, *et seq.*, based on his national origin and religion, he was subjected to a hostile work environment, his employment with St. Alphonsus Regional Medical Center, Inc. (St. Alphonsus) was terminated in retaliation for complaining about the discrimination and

St. Alphonsus violated and/or breached the covenant of good faith and fair dealing implicit in his employment contract. Mr. Mendez is Hispanic and Judge Dale properly set forth that a claim for discrimination because Plaintiff is Hispanic is actually a race claim under Title VII not a national origin claim. Plaintiff does not dispute this legal clarification by Judge Dale.

Plaintiff retained counsel and filed an Amended Complaint on May 25, 2012 (Dkt. 5). The Amended Complaint raises the same causes of action as set forth in the original Complaint but breaks the claims out into eight different causes of action. St Alphonsus filed a motion for summary judgment on all claims on January 15, 2014 (Dkt. 48). Mr. Mendez was given until July 31, 2014 to file his reply to the motion and oral argument on the motion was heard by Judge Dale on August 28, 2014.

Mr. Mendez began working for St. Alphonsus in 2007 as a radiology technician at a clinic in Nampa referred to as the Iowa Clinic. He started as a part-time employee but

became a full-time employee on March 15, 2009.  In exchange for the full-time position,

Mr. Mendez agreed to perform non-radiology assignments under the supervision of the

Lead Nurse, Rachel Croft, and Clinic Manager, Connie Miller.

Late November of 2009, Mr. Mendez started refusing to perform assigned duties,

complained to co-workers about his supervisors and the work environment at the clinic.

Mr. Mendez emailed some of his complaints to Judi Vejar on November 27, 2009 (Dkt.

72-1, pp. 36-37). Specific examples are included in the Report and Recommendation and

are incorporated by reference.  Mr. Mendez also alleges he informed Ms. Vejar in late

2009, that Ms. Miller made offensive comments about his Hispanic race and his religion.

Other employees have corroborated that Ms. Miller made some inappropriate comments

directed at Mr. Mendez.  These comments could be interpreted to be about his Hispanic

race and/or people who belong to the Church of Jesus Christ of Latter Day Saints (LDS or

Mormon religion).

In February of 2010, Mr. Mendez's co-workers began complaining to Ms. Miller

about Mr. Mendez's negative attitude and disrespect for management.  One person who

complained via email was Leonna McDowell whom Mr. Mendez assisted in the

laboratory.  She indicated Mr. Mendez's negative attitude had been going on for about a

year. (Dkt. 48-7, p. 64.)  On February 3, 2010, Mr. Mendez applied for a transfer within

St. Alphonsus.  (Dkt. 72-1, p. 39.)  He did not receive the transfer.

Certain job performance issues continued and on or about May 7, 2010, Ms. Miller gave Mendez a verbal warning regarding his behavior that morning.[1] This verbal warning was followed up with a written reprimand dated May 18, 2010 which was signed by Mr. Mendez, Ms. Miller and Ms. Croft. (Dkt. 72-4, pp. 3-4). Mr. Mendez denied the accusations in the reprimand about his attitude, negative or inappropriate communication, that his imaging was taking too long, leaving the lab for film and leaving a door propped open.

Following the May 7, 2010 meeting with Ms. Miller, Mr. Mendez emailed a complaint to St. Alphonsus' Organizational Integrity Program (OIP) Local Integrity Officer. In the OIP complaint, Mr. Mendez alleged Ms. Miller had made offensive remarks about his personal hygiene and the LDS church. Upon receipt of the OIP Complaint, St. Alphonsus began an investigation into Mr. Mendez's allegations. The investigation was confidential and there is no evidence in the record that Ms. Miller or Ms. Croft had knowledge of the investigation as it was occurring. Mr. Mendez met with the investigator, Dennis Wedman, on or about May 18, 2010. (Dkt. 72-4, p.2.) Mr. Mendez testified in his deposition he did not otherwise discuss the investigation with

---

[1] Mr. Mendez acknowledged the May 7th meeting in his deposition, but in his unsigned affidavit in response to the motion for summary judgment he appears to claim the May 7th meeting did not take place. Mr. Mendez did not object to the May 7th meeting reference in the May 18, 2010 exhibit which he signed and attached to his affidavit. (Dkt. 72-4, pp. 3-4.) Regardless, the Court finds whether or not the May 7th meeting occurred on that exact date is not determinative of whether or not the pending motion for summary judgment should be granted.

other employees.[2] As a result of the OIP investigation and interviews with Mr. Mendez and other employees, Ms. Miller resigned in lieu of discharge effective June 1, 2010. Brenda McCord became the interim Clinic Manager.

On May 25, 2010, Ms. Croft issued a formal written Disciplinary Action Record (Record) citing Mr. Mendez for insubordination and retaliation. (Dkt. 48-8, p. 5.) The Record sets forth allegations that Mr. Mendez disobeyed orders not to retaliate against Ms. McDowell who had complained about Mr. Mendez's actions on May 7th. *Id.* The Record instructs Mr. Mendez that he may contact St. Alphonsus' Chief Operating Officer (COO) Patti Brahe if he thinks he has been unfairly disciplined. *Id.* The Record also states any further violation will result in immediate termination. *Id.*

Ms. McCord and Mr. Croft completed an annual written employee evaluation with Mr. Mendez on June 17, 2010. The evaluation indicated Mr. Mendez resisted performing other assigned duties, needs to improve his communication and teamwork and directs Mr. Mendez to direct his concerns to his manager versus his co-workers. (Dkt. 48-8, p. 6-10.)

On June 23, 2010, Mr. Mendez emailed COO Brahe requesting the May 18th written reprimand and the May 25 Record and certain comments on the June 17, 2010 evaluation be cleared from his personnel file. (Dkt. 48-8, pp. 14-19.) Mr. Mendez complained in his email about the environment at the Iowa Clinic and acknowledged he

---

[2]There are no facts in the record suggesting the Ms. Miller's review of the written reprimand with Mr. Mendez on May 18, 2010 regarding events on May 7, 2010 was due to the fact he was set to meet with Mr. Wedman on that same day at lunch. Stated another way, Plaintiff has not presented any evidence Ms. Miller was aware of Mr. Mendez's scheduled meeting regarding his OIP complaint with Mr. Wedman on May 18, 2010.

refused to perform certain additional lab duties "because . . . there is a lack of teamwork and proper organization at his clinic." (Dkt. 48-8, p. 18.). Ms. Brahe met with Mr. Mendez about his concerns on July 20, 2010 and in a letter dated July 26, 2010 declined to change Mr. Mendez's personnel record. (Dkt. 48-8, p. 20.) Ms. Brahe offered suggestions about changes Mr. Mendez could make in his job performance to make the recent evaluation and discipline less of an issue in the future. *Id.*

Between July and early October of 2010, additional conduct and performance issues were noted by supervisors and management of the Iowa Clinic. Specific details are identified in the Report and Recommendation at pages 9-10 and are incorporated by reference. On October 15, 2010, the new Clinic Manager Shane Allen terminated Mr. Mendez: "because of his unsatisfactory work performance, including: (1) his continued negative comments about co-workers despite multiple written warnings; (2) his continued violation of other express instructions from management; (3) his refusal to perform assigned work and refusal to assist coworkers; and (4) general performance issues, including wasting time on email and taking too long to perform his work." (Allen Dec. ¶ 17, Dkt. 48-4, pp. 4-5.)

There is no dispute that Mr. Mendez knows how to perform x-rays, is good with patients, served as a translator for a number of patients, and helped with other assignments at the Iowa Clinic. (See letters about quality of x-rays from the Iowa Clinic and personal letters of reference Dkt. 72-1, pp. 14-23.) However, it is also undisputed

from the record that management had concerns about his interactions with co-workers, his ability to follow the chain of command, his respect for supervisors and the amount of time it took him to complete x-rays. The time concern is a reoccurring issue as seen on his July 2008 evaluation "Rauls quality of x-ray was high, could improve speed." (Dkt. 72-1, p. 7. )

In his objections, Mr. Mendez notes that another employee, Beverly Tremayne, also complained about Ms. Miller's offensive comments and the Report and Recommendation makes no mention of Ms. Tremayne and that she was given similar poor evaluations after filing a complaint with OIP. In Mr Wedman's email to Mr. Mendez on June 1, 2010 he indicates he is getting back to Mr. Mendez regarding "the complaint you filed on behalf of Beverly Tremayne." (Dkt. 72-1, p.9.). Mr. Wedman states in his email the investigation is complete regarding concerns of "unlawful Harassment, Retaliation and Inappropriate comments made towards you and others." *Id.* Mr. Wedman indicates "the hospital has taken appropriate action to insure you or others do not experience similar concerns." *Id.* The Court accepts for purposes of the pending motion that Mr. Mendez as well as other employees were concerned about offensive Hispanic or religious comments. As to specific allegations of similar alleged retaliation in the form of poor evaluations or written discipline records, the Court notes Plaintiff has

not provided such documents in his exhibits contained Dkt. 72[3] and there is no affidavit from Ms. Tremayne in the record for the Court to consider for purposes of the motion for summary judgment.[4]

Mr. Mendez also includes a letter from Charlene Hymas (who was the switchboard operator at the Iowa Clinic) to Mr. Mendez's law firm in February of 2012 that indicates she observed Ms. Miller making fun of Mr. Mendez's eating habits on numerous occasions and Ms. Croft had Mr. Mendez doing lots of different assignments in the lab. (Dkt. 72-1, pp.34-35.). Ms Hymas does *not* say the comments about Mr. Mendez's eating habits were because he was Hispanic. Ms. Hymas shares her belief Ms. Croft was holding Ms. Hymas (not Mr. Mendez) back from getting other jobs at St. Alphonsus and that she believed Ms. Croft treated her poorly because of her prejudice towards the LDS religion. *Id.* Ms. Hymas does not give a specific example of offensive comments being made about her religion by Ms. Croft, only that this is why she believed Ms. Croft treated her poorly.

---

[3]Mr. Mendez claims Judge Dale did not consider Exhibit 4 of Dkt. 72. The Court has reviewed Dkt. 72 in detail. It appears the handwritten coversheet stating "Exhibit 4 8 Pages" is missing from Dkt. 72. The documents which make up Exhibit 4 (as evidenced by Exhibit 4 attached to Plaintiff's Objections, Dkt. 79-1, pp. 11-19) were the same documents attached as part of Dkt. 72, pp. 32-39. This Court has reviewed and considered such documents and referenced the same where the Court finds such documents are relevant. The Court finds any alleged prejudice from Judge Dale not considering Dkt. 72 are denied.

[4]While Mr. Mendez has an opinion Ms. Tremayne was "forced" to settle her litigation with St. Alphonsus, Ms. Tremayne is not a party to this action and the Court cannot speculate regarding her claims and the basis for such claims. Mr. Mendez also mentions in his objections that he and Ms. Tremayne had a Joint Prosecution Agreement with the original attorney representing their interests. Such an agreement may be relevant to any claim Mr. Mendez may pursue against his former attorneys, but St. Alphonsus was not a party to such an agreement and the agreement has no bearing on whether or not the legal requirements for Mr. Mendez's claims have been satisfied by Mr. Mendez.

**ORDER ADOPTING REPORT AND RECOMMENDATION - 9**

**OBJECTIONS**

Mr. Mendez objects in its entirety to the Report and Recommendation issued by Judge Dale.  The Court will address the objections to the extent the Court finds the objections are relevant to the legal issues presented in the motion for summary judgment.

**1. Judge Dale's Alleged Partiality**

Mr. Mendez goes to great length to argue Judge Dale has not acted impartially in this case.  The Court acknowledges Mr. Mendez's frustrations with the legal system, but he has failed to set forth facts that support a finding Judge Dale had a duty to recuse herself or ruled in a manner demonstrating partiality. First, Mr. Mendez complains that Judge Dale's former law firm represented St. Alphonsus, therefore she is not impartial. Judge Dale was appointed as a federal Magistrate Judge on March 31, 2008.  Prior to her appointment to the federal bench, her law firm did represent St. Alphonsus. The fact that St. Alphonsus may have been a client prior to Judge Dale being appointed to the bench does not require her to recuse herself from a case involving St. Alphonsus on an *unrelated* matter that was filed almost four years after Judge Dale left the law firm.  *See State of Idaho v. Zamora*, 933 P.2d 106, 107-08 (Idaho 1997) (a judge is only disqualified from presiding over the same case in which he [or she] previously represented a party, not a subsequent unrelated one).  One could legitimately argue that a newly appointed judge should not handle any matters he or she had knowledge of prior to being appointed to the bench or for a client he or she represented in private practice for a reasonable amount of

time after taking the bench.  Judge Dale is not a newly appointed judge.  She has served

on the federal bench for over six years.  She did not represent St. Alphonsus in the matter

in controversy and could not have had knowledge of the matter in controversy since the

alleged unlawful conduct by St. Alphonsus occurred *after* Judge Dale became a judge in

2008.  This Court can find no authority that prohibits a judge from presiding over a case

*unrelated* to prior representation of the party but involving a former law firm's client four

years[5] after taking the bench.  *See e.g., Chitimacha Tribe of La. V. Harry L. Laws Co.*,

690 F.2d 1157, 1166 (5th Cir. 1982).

Second, in this case not all of the parties consented to Judge Dale presiding over

the matter, and pursuant to District of Idaho case assignment procedures, the matter was

reassigned to a District Judge. Based on its heavy civil and criminal caseload, this Court

has a standard practice of referring civil cases to magistrate judges for orders on non-

dispositive matters and report and recommendations on dispositive matters.  The case was

referred by this Court back to Judge Dale in the normal course of referrals. The

undersigned, not Judge Dale, is now the presiding judge in this matter.

Third, Mr. Mendez has presented no facts that support recusal under the applicable

statutes every federal judge must consider to determine if that judge can hear a case.

In an abundance of caution, the Court has specifically reviewed the requirements of 28

---

[5]The Complaint was filed in 2012 and at that time Judge Dale had been on the bench almost four years.  Mr. Mendez's objections regarding Judge Dale's alleged partiality were filed on September 29, 2014 when Judge Dale has completed nearly 6 and a half years on the federal bench.

U.S.C. § 144 and finds no factual support for the appearance of or actual bias or prejudice by Judge Dale to require disqualification. The Court also reviewed the requirements of 28 U.S.C. § 455 and finds there are no applicable statutory requirements that Judge Dale recuse or disqualify herself from this case.

Fourth, Mr. Mendez never filed a motion seeking Judge Dale to recuse herself. Curiously, the complaint about Judge Dale's alleged partiality is only raised *after* she has issued a Report and Recommendation that recommends granting the Defendant's motion for summary judgment. "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994).

Fifth, Mr. Mendez argues Judge Dale has prejudiced him by allowing his counsel to withdraw. The facts do not support this accusation. In reviewing the file in this matter, including Mr. Mendez's complaint to the Idaho State Bar regarding his attorney Mr. Haws, he indicates he had discussed his case with numerous attorneys. It appears from Dkt. 24 that Mimura Law Offices represented Mr. Mendez on this matter and Mr. John Bujak was also involved in reviewing the case to some extent. In federal court, Mr. Haws represented Mr. Mendez in this matter and after his withdrawal, the Court aided Mr. Mendez in finding a lawyer by suggesting he contact the District of Idaho's ADR/Pro Bono Coordinator. The Coordinator was able to connect Mr. Mendez with Mr. Johnson who appeared on his behalf until filing his motion to withdraw. These facts suggest the issue is not the Court's granting of counsels' motion to withdraw, but with Plaintiff's

ability to cooperate with his counsel to move his litigation forward.

In the first motion to withdraw (Dkt. 17-1), Mr. Haws states:

> In recent months, communications with Mr. Mendez have become strained and difficult. Despite repeated attempts to confer with Mr. Mendez concerning the prosecution of this matter, Mr. Mendez has become uncommunicative and has refused to return telephone calls or to meet to discuss important issues related to this case. Mr. Mendez has repeatedly conditioned his cooperation in prosecuting this matter upon our fulfillment of unreasonable and impossible demands.
>
> Mr. Mendez has refused to cooperate in the discovery process. Mr. Mendez is obligated to respond to Defendant's written discovery request by December 21, 2012. Although this Firm requested Mr. Mendez provide certain documentation by December 14, 2012, and provided him several weeks to accomplish the task, as of the date of this filing Mr. Mendez has not provided all the requested documentation. Rather, he has firmly communicated his refusal to cooperate in this endeavor. Mr. Mendez's refusal to cooperate in the discovery process impedes this Firm's ability to fulfill its ethical obligations to the Court. Mr. Mendez has substantially failed to fulfill his obligations to this Firm by refusing to cooperate in the discovery process and to adequately and appropriately communicating with counsel.
>
> Mr. Mendez has failed to heed this Firm's warning and admonishment regarding certain conduct, which could substantially impair and hinder his case.
>
> This firm has discussed the issues above with Mr. Mendez and the parties agree that a continuing attorney-client relationship is untenable.

Mr. Mendez complains his attorneys would not do what he wanted, but representation is a two-way street. An attorney cannot do things a client thinks are a good idea which are not allowed under the applicable rules, statutes, or code of conduct. An attorney must rely on help from his or her client to understand the facts and evaluate those facts in light of the applicable law. A client must rely on his or her attorney to explain the legal

standards that apply and the strengths and weaknesses of the client's case. The Court is allowed to rely on the representations of Mr. Mendez's attorneys, as officers of the Court, regarding the breakdown in communication and failure to cooperate as establishing good cause to grant the motions to withdraw. Mr. Haws represented Mr. Mendez agreed a continuing attorney-client relationship was "untenable." This cannot be the fault of Judge Dale as in such circumstances a court must grant the motion to withdraw as it cannot force an attorney to continue to represent a client based on the reasons provided in counsel's affidavit.

The second motion to withdraw (Dkt. 54), raises the same type of concerns. Judge Dale again relied on the affidavit of counsel to find good cause existed to allow the attorney to withdraw. In reviewing the entire record as well as the two motions to withdraw filed in this case, this Court agrees good cause was shown which would have allowed any judge to have granted those motions.

A judge is sworn to uphold the law and treat all litigants fairly. Judge Dale has correctly set forth the law for each claim and applied the facts to the law. Judge Dale's Report and Recommendation is subject to review by this Court. After reviewing the record in total, the Court finds Mr. Mendez's complaints regarding the alleged "partiality" of Judge Dale are unfounded and such objections are denied.

**2. More Time for Discovery**

Mr. Mendez complains he was not given more time to conduct discovery. Pro se litigants are held to same procedural rules as counseled litigants. *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987). Mr. Mendez failed to file a Fed. R. Civ. P. 56(d) motion related to the summary judgment motion. He "assumes" St. Alphonsus would not have agreed to further discovery, so he did not request an extension of the discovery deadline. Failing to timely file a motion for relief is not a proper basis to allow a Court to grant an untimely request for more discovery.

Additionally, a Fed. R. Civ. P. 56(d) motion for further discovery prior to a court ruling on a motion for summary judgment requires the moving party to point to "specific" evidence and explain how such evidence would preclude summary judgment. *Emplrs. Teamsters Local Nos. 175 & 505 v. Clorox Co.*, 353 F.3d 1125, 1129-30 (9th Cir. 2004). Mr. Mendez only argues in general terms he needs to complete more discovery not what "specific" discovery from identifiable witnesses he seeks, what such testimony or documents would prove and how it would be relevant to the pending motion. When a party files a lawsuit, that party has a duty to prosecute its claims and a failure to diligently seek and collect relevant discovery materials since 2010 until July 2014 does not support or establish good cause for even more time to complete unknown discovery.

Further, after Judge Dale granted the second motion to withdraw in February 12, 2014 (Dkt. 56), Mr. Mendez had an additional five and a half months to file a response to

the motion for summary judgment as well as find a new attorney. Judge Dale appears to have been *very* lenient in granting Plaintiff more than adequate time to gather his documents, get affidavits, move to depose witnesses, and file a response that complies with the rules. Mr. Mendez had the right under the procedural rules and statutes to object to Judge Dale's Order not to grant a further extension beyond July 31, 2014. *See* Fed. R. Civ. P. 72(a). Mr. Mendez never filed an objection with this Court. For these reasons, the Court denies Mr. Mendez's objections that he did not have adequate time to conduct discovery or respond to the motion for summary judgment.

### 3. Substantive Law Challenges

Judge Dale accurately set forth the law applicable to the review of a motion for summary judgment and the substantive claims of Plaintiff. Plaintiff has made no objections to the legal standards articulated by Judge Dale in the Report and Recommendation. The Court acknowledges Plaintiff made this Court's job difficult in reviewing the motion for summary judgment by filing an unsworn affidavit and not filing a memorandum of law or a statement of undisputed facts. Regardless, this Court has gone back through the record and has viewed the facts in a light most favorable to Plaintiff. Plaintiff is reminded that undisputed facts presented by the moving party that are not favorable to Plaintiff's claims cannot be ignored by the Court. Plaintiff had a duty to rebut facts presented by St. Alphonsus with evidence, not mere speculation. Fed. R. Civ.

P. 56(c).  A party that fails to properly support an assertion of fact or fails to properly

address another party's assertion of fact allows the Court to consider the fact undisputed

for purposes of the motion.  Fed. R. Civ. P. 56(e).

While the Court finds Plaintiff has raised no objections regarding the legal

standards that apply to his claims, in order to add context to this Order the Court will

restate some of the legal standards as set out in the Report and Recommendation.  To

begin with, summary judgment is appropriate if there are no genuine disputes as to any

material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a).  The Court incorporates by reference the detailed explanation of the standard of

review for summary judgment motions. Report and Recommendation at 12-13.

### A. Disparate Treatment on the Basis of Race or Religion

To prove discrimination on the basis of race or religion, Mendez must introduce

evidence from which a reasonable jury could conclude, in light of common experience,

that it was more likely than not that St. Alphonsus' adverse action was motivated by

consideration of his race or religion. *See McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802-05 (1973) (explaining plaintiff's burden under Title VII is to demonstrate that

defendant's proffered explanation for an adverse action is more likely than not a pretext

for discrimination); *U.S. Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711, 715 (1983)

("The factual inquiry in a Title VII case is whether the defendant intentionally

discriminated against the plaintiff.") (quotations omitted). When evaluating discrimination claims at the summary judgment stage, the courts employ the familiar burden-shifting analysis developed in *McDonnell Douglas. See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 745 (9th Cir. 2003).

Under *McDonnell Douglas*, an employee alleging disparate treatment must first establish a prima facie case of discrimination. 411 U.S. at 802. If Mr. Mendez establishes a prima facie case, "the burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged actions." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If the employer meets this burden, the burden of production shifts back to the employee to show the employer's reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Throughout the burden-shifting process, the employee has the burden of persuading the trier of fact that the employer intentionally discriminated against the plaintiff. *Douglas v. Anderson*, 656 F.2d 528, 531 (9th Cir. 1981) (citing *Burdine*, 450 U.S. at 256). In other words, "[t]o survive summary judgment on his disparate treatment claim, [Mr. Mendez] must establish that his job performance was satisfactory and provide evidence, either direct or circumstantial, to

support a reasonable inference that his termination [or discipline] was discriminatory."
*Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

To establish a prima facie case of disparate treatment, Mr. Mendez must show that
"(1) he is a member of a protected class; (2) he was qualified for his position; (3) he
experienced an adverse employment action; and (4) similarly situated individuals outside
his protected class were treated more favorably, or other circumstances surrounding the
adverse employment action give rise to an inference of discrimination." *Id.*

Judge Dale found Plaintiff met the threshold for establishing a prima facie case
and this Court agrees Plaintiff has met this initial burden. What Plaintiff failed to do was
respond to the legitimate explanations for his termination that are unrelated to his alleged
discrimination based on race and religion.

After finding the prima facie case, the burden shifted to St. Alphonsus to produce
evidence of a legitimate, nondiscriminatory reason for the adverse employment action.
*Rose v. Wells Fargo & Co.*, 902 F.2d. 1417, 1420 (9th Cir. 1990). Performance-related
concerns are sufficient to rebut the presumption of discriminatory intent, *Pottenger*, 329
F.3d at 746, as is evidence that an employee disobeyed a direct order from a supervisor.
*Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). St. Alphonsus set
forth several legitimate, nondiscriminatory reasons for disciplining and negatively
evaluating Mr. Mendez. Mr. Mendez may disagree regarding some of the examples of
non-compliance with management's instructions, but he did not present evidence to

establish the reasons for his termination as set forth in Mr. Allen's Declaration were pretextual. Mr. Mendez does not dispute that he made negative comments to coworkers , refused to perform duties in the laboratory, failed to follow the chain of command and direct orders from his supervisors.

In order to survive summary judgment, Mr. Mendez had the legal duty to raise a genuine issue of material fact concerning whether St. Alphonsus' articulated reasons for its adverse employment actions were pretextual to discrimination. *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1212 (9th Cir. 2008). Mr. Mendez could demonstrate pretext by producing either direct or circumstantial evidence that St. Alphonsus' adverse employment actions were "due in part or in whole to discriminatory intent." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004). Mr. Mendez failed to present such evidence. Instead, he restated his evidence used to support his prima facie case. This is insufficient as a matter of law to carry his burden at this third stage of analysis. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994). Having failed to carry his burden, St. Alphonsus is entitled to summary judgment on this claim. Plaintiffs objections are denied.

**B.     Hostile Work Environment**

Mr. Mendez next claims St. Alphonsus subjected him to racially or religiously based harassment that created a hostile work environment based on the comments of Ms.

Miller. To prevail on his hostile work environment claim, Mr. Mendez must show: "(1) that he was subjected to verbal or physical conduct of a racial or [religious] nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). In particular, Mr. Mendez must prove that the environment at the Iowa Clinic was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

There is no dispute that Mr. Mendez established and other employees corroborated that Ms. Miller made unwelcome and subjectively offensive comments about Mr. Mendez. But the Court must determine if the conduct was so "severe or pervasive" that a fact-finder could reasonably conclude Mendez was subjected to an abusive work environment.

In *Harris v Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993) the Supreme Court held:

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "'[M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violation Title VII." *Id.* at 787 (citing *Rogers v. EEOC*, 454 F2d 234, 238 (5th Cir. 1971)). These standards for judging hostility are sufficiently demanding to ensure Title VII does not become a "general civility code." *Oncale v. Sundowner Offshore Services, Inc.* 523 U.S. 75, 80 (1998).

After Mr. Mendez filed his OIP Complaint, it was immediately investigated and the investigation resulted in the resignation of Ms. Miller as Clinic Manager. Mr. Mendez fails to show that between June 1, 2010 and his termination any further offensive comments were made by supervisors or co-workers. Absent such evidence, the Court finds as a matter of law, the limited examples and isolated incidents of offensive conduct presented by Plaintiff in this case do not rise to the level of a hostile work environment in that Plaintiff has failed to establish the conduct was so severe or pervasive as to alter the conditions of his employment and create an abusive working environment. The hostile work environment claim must be dismissed.

**C.     Retaliation**

Mr. Mendez's last Title VII claim is that St. Alphonsus retaliated against him for reporting Ms. Miller's discriminatory remarks to human resources and through the OIP. Mr. Mendez claims after filing his OIP complaint on May 7, 2010, he was given the May 18, 2010 written reprimand, a Disciplinary Action Record on May 25, 2010, a negative performance evaluation June 17, 2010 and ultimately terminated in October 2010. Mr. Mendez infers the negative reviews and evaluations were forms of retaliation by St. Alphonsus for his initial reporting of alleged unlawful conduct and this retaliation led to his termination in October of 2010.

"To prevail on a Title VII retaliation claim, plaintiff must establish that she engaged in activity protected by Title VII, that she was subjected to an adverse employment action, and that there was a causal link between the protected activity and the adverse employment action." *EEOC v. Dinuba Med. Clinic*, 222 F.3d 580, 586 (9th Cir. 2000). In *University of Texas Southwestern Med. Ctr. v. Nassar,* __ U.S. __, 133 S.Ct. 2517, 2534 (2013), the Supreme Court recently clarified the causal link requirement holding "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." This ruling by the Supreme Court raised the bar for plaintiffs in the Ninth Circuit where the standard had previously been a plaintiff merely had to establish the protected activity was a "motivating factor" for the adverse action by the employer. *Siring v. Oregon State Board of Higher Education*, 977 F. Supp. 2d 1058, 1061 (D.

Oregon 2013). The *McDonnell Douglas* burden-shifting framework also applies to Mendez's retaliation claim. *Yartzoff v.Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987).

"An employee engages in protected activity when [he] opposes an employment practice that either violates Title VII or that the employee reasonably believes violates the law." *Id.* Here, Mr. Mendez engaged in protected activity by reporting concerns about Ms. Miller's alleged discriminatory conduct in late 2009 and to the OIP on May 7, 2010. But Mr. Mendez's claim fails because he cannot establish that "but for" his complaints about Ms. Miller, he would not have been terminated five months later. First, it is undisputed the alleged discriminatory conduct ceased by the time Ms. Miller resigned on June 1, 2010. Second, there is no evidence that *any* of the decision makers on Mr. Mendez's termination in October 2010 (as well as the decision makers on the May 25, 2010 and June 17, 2010 reprimands) had any knowledge of his reports of discriminatory conduct in 2009 and 2010. Instead, the undisputed evidence establishes no supervisor nor the Clinic Managers after Ms. Miller were aware of or had knowledge of Mr. Mendez's protected activity of reporting alleged discriminatory conduct in 2009 and 2010.

The Court acknowledges if the legal standard for causation for a retaliation claim was a "motivating factor" instead of a "but for" analysis, Plaintiff's retaliation claim might survive summary judgment, but this Court must apply the law as clarified by the Supreme Court. Therefore, this Court finds based on the record before it and viewing the facts in a light most favorable to Plaintiff, no reasonable juror could find without relying

on pure speculation that his protected activity was the "but for" cause of Mr. Mendez's termination. Plaintiff's objections are denied and summary judgment must be granted on this claim.

### D. Implied Covenant of Good Faith and Fair Dealing

Plaintiff objects to the dismissal of this claim on the grounds his retaliation claims does not survive. Plaintiff also states "he does not understand much of what this [cause of action] means or why the first set of Lawyer (sic) included this claim." (Dkt. 79, p. 20.)

Plaintiff does not dispute he was an "at-will" employee who could be terminated at any time. A breach of the covenant of good faith and fair dealing requires conduct by an employer that "violates, nullifies or significantly impairs any benefit of the employment contract." *Metcalf v. Intermountain Gas Co.,* 778 P.2d 744 (Idaho 1989). This Court has determined the claim for retaliation fails as a matter of law and there is no other evidence showing conduct by the employer "violates, nullifies or significantly impairs" any benefit of Mr. Mendez's employment agreement with St. Alphonsus. Therefore, an employer has a right to terminate an at-will employee without having to show good cause for the termination. *Id.* St. Alphonsus did not breach the covenant of good faith and fair dealing

by terminating an at-will employee.  Because Plaintiff has not rebutted the fact he is an at-will employee, the claim must be dismissed. Plaintiff's objections are denied.

## CONCLUSION

The Court understands that employment law is a difficult and complex area of the law and even more so for a pro se litigant not schooled in the law. However, the shifting burden analysis framework is not new to employment law and the facts that the Court accepted as true to allow the Plaintiff to survive the initial hurdles of his claims, do not satisfy his legal burden of production of evidence/facts to rebut Defendant's legitimate business reasons for terminating Mr. Mendez's employment.  No Court would find the alleged comments by Ms. Miller acceptable. The Court can infer St. Alphonsus did not find the comments acceptable under their policies since after completing the OIP investigation, Ms. Miller resigned in lieu of discharge.  Our employment laws are designed to give the employer the first opportunity to stop discriminatory conduct in the workplace once it is brought to the employer's attention.

As to the disparate treatment claim, Plaintiff failed to carry his burden to establish genuine issues of fact to support a finding that the business reasons for his termination were pretextual. Rather the employer provided undisputed evidence that while Plaintiff was a good x-ray technician there were other issues regarding his attitude, his ability to

follow the directions of supervisors and assisting with other lab assignments which impacted his overall job performance.

As to the hostile work environment, Plaintiff had the burden to show the alleged discriminatory conduct was so severe and pervasive to alter his conditions of employment. The Court assumed the discriminatory comments occurred, but that such comments alone were insufficient to satisfy the severe and pervasive requirement of his claim as Plaintiff did not establish his conditions of employment were altered by the alleged discrimination.

While the Plaintiff feels strongly his report to the OIP led to disciplinary action and ultimately his termination, this belief is not supported by the undisputed facts in the record. Mr. Mendez's belief alone cannot satisfy the "but for" causation test for a retaliation claim when legitimate job performances reasons have been presented to support the employer's decision to terminate Mr. Mendez.

Plaintiff was an at-will employee and St. Alphonsus was within its legal rights to terminate his employment. No genuine issues of material fact exists that prevent as a matter of law summary judgment from being granted in favor of St. Alphonsus. Plaintiffs' objections are respectfully denied.

## ORDER

**IT IS ORDERED** that the Report and Recommendation (Dkt. 78) shall be **INCORPORATED** by reference and ADOPTED.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Dkt. 48) is **GRANTED** and all of Plaintiff's claims are DISMISSED.

DATED:  **November 13, 2014**

Honorable Edward J. Lodge
U. S. District Judge